UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EVERTON HIBBERT,

                  Petitioner,

    -vs-

THOMAS POOLE,

              Respondent.

_____

**DECISION AND ORDER**
No. 03-CV-6050

## INTRODUCTION

Petitioner, Everton Hibbert ("Hibbert"), filed this *pro se* petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in New York State Supreme

Court (Monroe County) following a guilty plea. The parties have consented to disposition of this

matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The conviction here at issue stems from Hibbert's guilty plea to charges of second degree

murder and second degree criminal possession of a weapon in connection with the shooting death

of his estranged girlfriend, Ella Reaves ("Reaves"). The shooting occurred on March 24, 2000, as

Reaves left the nursing home where she worked in the Town of Pittsford, New York. Hibbert

then fled to New York City.

On March 30, 2000, officers from the 28th Precinct of the New York City Police

Department received a phone call from a woman who said that her son had overheard a

conversation in which a man was claiming to have killed his girlfriend, a nurse, up in Rochester.

According to the tip, the man claiming to have killed his girlfriend was staying at an apartment in

Harlem. H.18, 164.[1] Detective Frank Pascarelli ("Pascarelli") confirmed with the authorities in

Rochester that such a crime had occurred and obtained a faxed photograph and description of the

alleged perpetrator. He and his partner, Detective Joseph Litrenta ("Litrenta"), went to the

address where they found the door ajar. They knocked and were told to enter. They knocked

again and said, "Police" as an unnamed male individual opened the door. H.10. Litrenta stated

that they had received a call that a woman was being held against her will in the apartment,

which was a ruse to keep the occupants of the apartment at ease. H.11, 28, 60. The man said that

there was no problem and that they could come in and look around. H.59. Once inside the

apartment, Litrenta and Pascarelli saw a man who matched the faxed photograph sitting on the

bed. H.33. The detectives asked all of the occupants for identification, but Hibbert did not have

identification on him. Litrenta asked Hibbert to step out in the hallway so that he could write

down Hibbert's contact information. H.64-65.

When Litrenta asked Hibbert his name, Hibbert "mumbled" a name that was not the name

they had been given by the Rochester police. H.65. Litrenta showed Hibbert the faxed

photograph they had received and asked him, "Do you know who this is?" H.66. Hibbert replied,

"Yeah, that's me." *Id.* Litrenta then pat-frisked Hibbert and handcuffed him. H.67. Pascarelli

escorted Hibbert back to the precinct in a marked police car that they had summoned to the

scene. Right after they got in the car, Pascarelli said, "You know what this is all about?" to

Hibbert. H.42. Hibbert replied, "I shot my girlfriend." H.43. There was no further conversation

after that.

---

[1] Citations to "H.__" refer to the transcript of the suppression hearing.

Once back at the precinct, Litrenta received a phone call from a detective in Rochester who advised him that after reading the *Miranda* warnings to Hibbert, he should ask Hibbert if he had an attorney. H.71. Litrenta recited the *Miranda* warnings to Hibbert from a pre-printed card, asking him if he understood each warning as it was read. H.73. Hibbert stated that he did and agreed to talk to the detectives. H.74. He never requested an attorney and did not demonstrate any reluctance in speaking to the police. H.74-75.

Hibbert then gave an oral statement which Litrenta reduced to writing. H.75. Litrenta read it back to Hibbert, who said it was accurate and agreed to sign it. H.76. In it, Hibbert stated that he had come to the United States from Jamaica about five years ago. He had been with Reaves, the victim, for about four years; they had a two-year-old daughter together. App. E at 34.[2] Hibbert stated that for several days, he followed Reaves after she left work and discovered that she was seeing another man. *Id.* On the day of the incident, Hibbert walked to the nursing home where Reaves worked. He said that he had a gun in his coat pocket and he waited for Reaves to come out after her shift. *Id.* When he saw her, he walked up to her and "started shooting at her." She fell to the ground and Hibbert began to run. *Id.* at 35. According to Hibbert, he spent several days living in the woods near the highway. He eventually ended up purchasing a bus ticket to New York City; when he arrived there he went to the apartment of his friend "Duce" who told him to turn himself in. *Id.* Hibbert stated that he thought about killing himself while he was on the run but then thought of his daughter and threw the gun away. *Id.* at 36. Litrenta then gave Hibbert a pad and pen asked to write down in his own handwriting what he had told Litrenta. H.78; *see*

---

[2]   Citations to "App. X at __" refer to respondent's Appendix of Exhibits, attached to its Answer (Docket #8).

App. E at 37-38.

On the drive back to Rochester, Investigator Gerber ("Gerber") of the Monroe County Sheriff's Department talked further with Hibbert about the shooting. Gerber informed Hibbert that the *Miranda* warnings still applied and that he did not have to discuss the incident, but Hibbert stated that he would talk about it. Hibbert told Gerber that he "had done everything for [Reaves]," treating her five children (four of whom were not his) like his own and giving her money. When he found out that she was seeing another man, she was "angry and jealous" and that is why he shot her. App. E. at 32. Gerber told Hibbert that he knew that Hibbert's friend Charlie had given Hibbert a ride to the nursing home and that he knew that Hibbert did not spend several days living in the woods. *See id.*

Hibbert was arraigned on April 18, 2000, on Monroe County indictment #162/2000 which charged him with two counts of murder in the second degree and one count of criminal possession of a weapon in the second degree. Hibbert initially pleaded not guilty to the charges. On June 23, 2000, the parties appeared for a hearing in New York Supreme Court (Monroe County) before Justice Mark on Hibbert's motion to suppress his statements made to police officers at the time of his arrest. At the conclusion of the hearing, the trial court reserved decision.

Several months later, on September 19, 2000, the parties again appeared in court. The prosecutor informed the court that Hibbert had agreed to plead guilty to the first and third counts of the indictment in exchange for a sentence promise of an indeterminate term of imprisonment of twenty years to life. According to the agreement, Hibbert also had to waive his right to appeal and withdraw his pending suppression motion.

Represented by a different attorney from the same public defender's office, Hibbert appealed his conviction to the Appellate Division, Fourth Department, of New York State Supreme Court. Counsel argued that Hibbert's waiver of appeal was invalid and that the negotiated sentence was unduly harsh and excessive. Hibbert submitted a *pro se* supplemental brief in which he argued that his oral and written statements to police at the precinct were obtained in violation of his Sixth Amendment right to counsel; that his oral statements in the police car were not admissible because he had not been issued his *Miranda* warnings; that his arrest was illegal; that his waiver of the right to appeal was invalid; and that his plea was involuntary. The Fourth Department unanimously affirmed his conviction. The New York Court of Appeals denied leave to appeal.

Acting *pro se*, Hibbert collaterally attacked his conviction by means of a motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 in which argued that his oral statements to police were obtained in violation of his Sixth Amendment right to counsel. Supreme Court (Mark, J.) denied the motion in a written decision and order entered December 6, 2002. Hibbert filed another C.P.L. § 440.10 motion on January 3, 2003, this time alleging that due to his low IQ, his guilty plea was not voluntary because he "did not understand anything that was taking place in the proceedings." *See* Supreme Court Order at 3 (App. R). Hibbert also contended that his trial counsel coerced him into pleading guilty. *See id.* at 2-3. Justice Affronti, who had been newly assigned to Hibbert's case following Justice Mark's retirement denied the second C.P.L. § 440.100 motion on the basis that the issues raised therein could have been included in the first C.P.L. § 440.10 motion. *See* Supreme Court (Affronti, J.) Letter Decision and Order dated January 24, 2003 (citing N.Y. Crim. Proc. Law § 440.10(3)(c)).

The Appellate Division, Fourth Department, of New York State Supreme Court denied leave to appeal on March 11, 2003.

This federal habeas petition followed on January 29, 2003. In the form habeas petition filed with this Court, Hibbert asserts that (1) his guilty plea was not made voluntarily because he was not aware of the nature and consequences of his guilty plea, due to his low IQ; and (2) that he pleaded guilty because trial counsel told him to do so. *See* Petition ("Pet.") at 5 (Docket #1). Hibbert also states that he was denied the effective assistance of counsel because counsel "coerced him into taking [a] plea." *Id.* Finally, Hibbert states that he was interrogated by the police in violation of his Sixth Amendment right to counsel; he claims that he was represented by counsel on another matter when he was arrested and questioned. *Id.* In his memorandum of law filed in support of the petition, Hibbert provides further argument regarding the Sixth Amendment claim and the voluntariness claim, stating that counsel "scared" him into taking the plea offer by telling him that he could receive up to 40 years to life in prison if he were convicted after a trial. *See* Petitioner's Memorandum of Law ("Pet'r Mem.") at  (Docket #1). Hibbert also contends that he was denied the effective assistance of counsel because counsel failed to investigate his case and counsel failed to advise him regarding the "viable defense" of intoxication. *Id.* He also contends that certain oral statements that he made to the police were inadmissible because they were given prior to the issuance of *Miranda* warnings and that his warrantless arrest violated the Fourth Amendment. For the reasons set forth below, the petition is denied.

**DISCUSSION**

**<u>Legal Effect of Guilty Plea</u>**

In *Tollett v. Henderson*, the Supreme Court reaffirmed the principle articulated in the "*Brady* trilogy"[3] that "a guilty plea represents a break in the chain of events which has preceded it in the criminal process." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). Once a defendant has pleaded guilty in open court to the offense with which he is charged, he may not subsequently raise independent claims relating to alleged violations of constitutional rights that occurred prior to the entry of the guilty plea. *Id.* Rather, a defendant "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*." *Id.* In other words, under *Tollett*, the only issues reviewable by a federal habeas court relate to whether the guilty plea in state court "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant," *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). Given the Supreme Court's clear holding in *Tollett*, Hibbert's guilty plea forecloses this Court's consideration on habeas review of the following three claims: (1) that he was questioned by the police despite being represented by counsel on another, unrelated matter; (2) that his oral statements to the police were inadmissible due to their being made prior to the issuance of *Miranda* warnings; and (3) that his arrest violated the Fourth Amendment.[4]

Thus, the only claims that Hibbert may raise before this Court are those relating to the voluntary nature of his plea and whether he received the effective assistance of counsel in regard

---

[3] *Brady v. United States*, 397 U.S. 742, 750 (1970); *McMann v. Richardson*, 397 U.S. 759, 770 (1970), and *Parker v. North Carolina*, 397 U.S. 790 (1970).

[4] The Fourth Amendment claim also must be dismissed because such a claim is not cognizable on federal habeas review. *See Kimmelmann v. Morrison,* 477 U.S. 365, 375 (1986) (holding that federal courts should deny habeas review where the state has provided "an *opportunity* for full and fair litigation of a Fourth Amendment claim," because "the remedy for Fourth Amendment violations provided by the exclusionary rule 'is not a personal constitutional right'") (quoting *Stone v. Powell*, 428 U.S. 465, 468 (1976) (emphasis supplied)).

to his decision to plead guilty. The Court will consider the ineffective assistance claim first.

**Merits of the Petition**

1.      **Ineffective Assistance of Counsel**

To prevail on a claim that trial counsel rendered constitutionally ineffective assistance, a habeas petitioner must show that counsel's representation fell below "an objective standard of reasonableness" under "[p]revailing norms of practice" and "affirmatively prove prejudice" by showing that there is a "reasonable probability" that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 693-94 (1984).  A petitioner must establish *both* that counsel's performance was deficient and that he was prejudiced as a result of counsel's errors in order to obtain relief on an ineffective assistance claim. *See id.* at 687.

A petitioner seeking to establish constitutionally ineffective assistance of counsel must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also*, *e.g.*, *United States v. Jones*, 918 F.2d 9, 11 (2d Cir. 1990) (holding that counsel's decisions should not be evaluated in hindsight). Even if a petitioner can establish that counsel was deficient, he still must show that he was prejudiced. *See id.* at 693-94. In the context of a guilty plea, the prejudice prong of the test is met by showing "a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *United States v. Coffin*, 76 F.3d 494, 498 (2d Cir. 1996) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

The Supreme Court explained in *Strickland* that "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." 466 U.S. at 693 (internal citation omitted). Rather, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Here, Hibbert contends that defense counsel failed to advise him that he had a viable defense of intoxication and failed to investigate the prosecution's case. As the Supreme Court explained in *Hill v. Lockhart*, the *Strickland* "prejudice" inquiry undertaken in many guilty plea cases "will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial." 474 U.S. at 59. Turning to the failure-to-investigate claim, Hibbert contends that defense counsel violated his Sixth Amendment rights when "he informed the defendant to plea[d] guilty to the charges . . . without the Court making a ruling of the evidence of the Suppression hearing to determine if the evidence would be used against the defendant during his trial if he elected to proceed to trial." Pet'r Mem. at 23 (Docket #1). The determination whether this alleged error "prejudiced" Hibbert by causing him to plead guilty rather than go to trial "will depend on the likelihood" that waiting for a decision on the suppression motion would have led counsel to change his recommendation as to the plea. *See id.* In turn, this assessment will depend "in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Id.*

Here, the suppression hearing was concerned with four categories of statements made by Hibbert: (1) oral statements made to Detective Litrenta at the New York City apartment where petitioner was apprehended that it was he in the faxed photograph of the suspect in the Reaves murder; (2) oral statements to Detective Pascarelli en route to the precinct that he knew why he was here and that it was because he "shot [his] woman"; (3) oral statements to Detective Litrenta at the precinct which were reduced to writing; (4) oral statements to Investigator Gerber en route from New York City to Rochester; and (5) Hibbert's handwritten statement made at request of Detective Litrenta. *See* Notice Pursuant to N.Y. Crim. Proc. Law § 710.30 (App. E).

Hibbert contends that his statement at the apartment identifying himself would not have been admissible because it was obtained as part of an illegal warrantless search. He also argues that his statement to Detective Pascarelli in the police car on the way to the precinct would not have been admissible because it was made prior to the issuance of the *Miranda* warnings. As to his admission made to Detective Pascarelli prior to the issuance of the *Miranda* warnings, Hibbert had a strong argument that it was not admissible because he was in a custodial situation, having been handcuffed and placed in a police car, and under *Miranda*, "interrogation refers not only to express questioning, but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response[.]" *People v. Hardy*, 223 A.D.2d 839, 636 N.Y.S.2d 459 (App. Div. 3d Dept. 1996) (citations omitted). Here, Detective Pascarelli's question to a handcuffed Hibbert in the patrol car, "You know what this is about?" was more than reasonably likely to elicit an incriminating response, given the events leading up to that point. Moreover, Hibbert also had a compelling argument that even the statements made to Detective Litrenta and Investigator Gerber, which apparently were made after

-10-

Hibbert waived his *Miranda* rights, were inadmissible as a matter of state constitutional law because Hibbert was represented by counsel on an unrelated matter and could not give a valid *Miranda* waiver except in the presence of counsel. *See, e.g.*, *People v. Grice*, 100 N.Y.2d 318, 763 N.Y.S.2d 227 (N.Y. 2003) (citing *People v. Arthur*, 22 N.Y.2d 325, 292 N.Y.S.2d 663 (1968)).

In New York state, an "indelible" right to counsel arises from the provision of the state's Constitution that guarantees due process of law, the right to effective assistance of counsel and the privilege against compulsory self-incrimination. *People v. Grice*, 100 N.Y.2d at 320 (citing N.Y. Const., art. I, § 6; *People v. Bing*, 76 N.Y.2d 331, 338-339, 559 N.Y.S.2d 474 (N.Y.1990)). The right is deemed "indelible" because once it "attaches," interrogation is prohibited unless the right is waived in the presence of counsel. *Id.* at 320-21 (citation omitted). There are several ways that "attachment" can occur, such as the formal commencement of a criminal action by the filing of an accusatory instrument. *Id.* at 321 (citations omitted). In addition, the indelible right to counsel can attach *before* commencement of a criminal action when a person in custody requests to speak to an attorney or when an attorney who is retained to represent the person "enters" the matter under investigation. *Id.* (citations omitted). The New York Court of Appeals has held that "a telephonic communication between a defendant's attorney and the police suffices to establish counsel's entry into a case, at which point the police are required to cease all questioning[.]" *Id.* (citing *People v. Gunner*, 15 N.Y.2d 226, 231-232, 257 N.Y.S.2d 924 (N.Y. 1965)). The indelible right to counsel is not dependent upon such "mechanical and arbitrary requirements" as a formal retainer, but rather "once the police know or have been apprised of the fact that the defendant is represented by counsel or that an attorney has communicated with the police for the

purpose of representing the defendant, the accused's right to counsel attaches[.]" *Arthur*, 22

N.Y.2d at 329 (quoted in *Grice*, 100 N.Y.2d at 321).

At the suppression hearing, Detective Litrenta testified that he was informed by the

Monroe County Sheriff's Department, which was investigating the homicide, to ask Hibbert

whether he was represented by counsel. However, there is no indication the Litrenta or anyone

else questioned Hibbert about this. Defense counsel called attorney Brian Wirley ("Wirley") of

the Monroe County Public Defender's Office who testified that he began representing Hibbert on

some family court matters in December 1999. H.182. The matter was open at the time of

Hibbert's arrest on March 30, 2000, and did not get resolved until May 30, 2000. H.183. Wirley

testified that on March 30, 2000, he faxed a letter to the Monroe County Sheriff's Department

stating that he represented Hibbert and requesting that Hibbert not be questioned unless counsel

was present.

Investigator Gerber testified on cross-examination that prior to speaking with Hibbert on

the way back to Rochester, he knew that the Sheriff's Department had received a faxed letter

indicating that Hibbert had an attorney. H.137. Gerber stated that he believed that his supervisor,

Investigator Sarkis, had "already taken care of that [issue]" by asking the detectives in New York

City to "add another question to the *Miranda* [warnings]," H.138, that is, to ask him specifically

if he had representation of counsel in connection with the homicide, H.172. When he spoke with

Hibbert on the drive back to Rochester, Gerber did not ask Hibbert if he knew who Wirley was or

if he had a matter pending in family court. Gerber did ask Hibbert if he knew who Roger Brazill

("Brazill") was because the fax indicated that Brazill was going to be assigned to represent him.[5]

---

[5] Brazill was, in fact, appointed to represent Hibbert.

H.142. Not surprisingly, Hibbert denied that he knew Brazill, who had not yet been assigned to represent him.

Investigator Sarkis admitted that he had the faxed letter from attorney Wirley of the Public Defender's Office at the time that he was discussing with the New York City detectives how to handling the questioning of Hibbert. Investigator Sarkis testified that the prosecutor, assistant district attorney Cruikshank, had attempted to contact attorney Brazill by telephone but was unsuccessful. H.152. Investigator Sarkis never made any attempt to contact Wirley. Investigator Sarkis admitted that he did not recall "getting into the details" about the faxed letter with the Public Defender's office when he spoke to Detective Litrenta in New York City and agreed to add a question to the *Miranda* warnings. H.169.

Based on the testimony presented at the hearing, Hibbert had a very strong argument that his oral and written statements at the precinct and his oral statements on the way back to Rochester were inadmissible because Hibbert's indelible right to counsel had attached, and that because he was represented, Hibbert could not validly waive his *Miranda* rights without counsel present. Arguably, the faxed letter from the Public Defender's Office to the County Sheriff's Department, in which Wirley requested that Hibbert not be questioned unless counsel was present, constituted an "entry" into the proceedings for purposes of the attachment of the right to counsel. *See Arthur*, 22 N.Y.2d at 329.

Assuming that there was a reasonable probability that Hibbert would have prevailed on his suppression motion and his statements held inadmissible, the question then becomes what was the likelihood that defense counsel would have changed his recommendation as to the advisability of pleading guilty. This requires looking at the strength of the prosecution's case.

Even without Hibbert's inculpatory statements, the state had a compelling case against him. There were at least two eyewitnesses to the event, the victim's sister and her boyfriend, who were picking the victim up after work and who saw the shooting from their car. There was Hibbert's friend Charlie, who had given Hibbert a ride to the nursing home on the day of the shooting, although it is not clear whether Charlie also witnessed the shooting. The forensics evidence was that Reaves was shot four times, which strongly supported the prosecution's contention that Hibbert acted with intent to kill. Finally, Hibbert's flight from Rochester after the incident was further evidence of his guilt. Certainly, the prosecution's case against Hibbert was strong, even without his admissions of guilt. Given these factors, the likelihood that defense counsel would have changed his recommendation as to the advisability of pleading guilty was not very high. Hibbert thus is unable to establish that he was prejudiced by pleading guilty prior to receiving a decision on the suppression motion.

I next turn to Hibbert's claim that trial counsel failed to properly investigate the viability of the defense of intoxication and to advise Hibbert that such a defense was available to him. Where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, "the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill v. Lockhart*, 474 U.S. at 59.  At the outset, the Court notes that intoxication is not actually a complete affirmative defense to a criminal charge; it rather merely reduces the gravity of the offense by negating an element of the crime charged. *People v. Harris*, 98 N.Y.2d 452, 474 n.4, 475 (N.Y. 2002) (citing N.Y. Penal Law § 15.25). While the requisite level of intoxication "need not be to the extent of depriving the accused of all power of volition or of all ability to form an intent," *People v.*

-14-

*Kastenhuber*, 57 A.D.2d 655, 393 N.Y.S.2d 480 (App. Div. 3d Dept. 1977) (internal quotation and citation omitted), the degree of intoxication that a defendant must demonstrate is quite high, *see*, *e.g.*, *People v. Monroe*, 277 A.D.2d 598, 716 N.Y.S.2d 114 (App. Div. 1st Dept. 2000) (rejecting contention that counsel should have argued intoxication defense; defendant's conduct in driving his vehicle away from the scene, his actions upon apprehension and his ability to repeatedly recount his detailed version of the events "simply d[id] not evince incapacitating intoxication").[6] Although it is true that a defendant may offer evidence of his intoxication whenever it is relevant to negate an element of the crime charged, *see* N.Y. Penal Law § 15.15, even an intoxicated person may be capable of forming the requisite intent. *People v. Robinson*, 161 A.D.2d 676, 555 N.Y.S.2d 448 (App. Div. 2d Dept. 1990) (citations omitted). Through counsel, Hibbert claimed at the sentencing hearing that on the day of the incident, he had spent the entire day drinking and smoking marijuana. Nevertheless, whatever Hibbert may have drunk or inhaled, it is highly unlikely that the jury would have found that his alleged state of intoxication negated or reduced his intent when he was capable of requesting a ride to the victim's place of employment, waiting outside for her to get off work, and then walking up to her and shooting her four times. In short, all of petitioner's actions that day appear to have been intentional and the product of sober and rational thought. Moreover, there appears to be no corroborating evidence of Hibbert's claims of intoxication, nor any details concerning its effect

---

[6] *Cf. People v. Gaines*, 83 N.Y.2d 925, 927 (N.Y. 1994) (defendant not entitled to jury charge on defense of intoxication where defendant's evidence lacked requisite details tending to corroborate his claim of intoxication, such as the number of drinks, the period of time during which they were consumed, the lapse of time between consumption and the event at issue, whether he consumed alcohol on an empty stomach, whether his drinks were high in alcoholic content, and the specific impact of the alcohol upon his behavior or mental state; neither witness's statement that defendant was "high" nor the police officer's comments that defendant had glassy eyes and alcohol on his breath "added sufficiently to defendant's statements to warrant the intoxication instruction").

on his mental processes.

Hibbert also contends that trial counsel "scared" him into pleading guilty by informing that if he went to trial and were convicted of all counts in the indictment, he could receive a sentence of up to 40 years to life. Hibbert does not state that trial counsel was incorrect in his assessment of the possible sentence exposure, although trial counsel appears to have overestimated the possible sentence exposure.[7]  While logically one could argue that a counsel

---

[7] In fact, it appears that trial counsel was incorrect in his calculation of Hibbert's possible sentence exposure. Trial counsel believed that Hibbert's "maximum exposure" was 40 years to life because in addition to the second degree murder charge, Hibbert also had a second degree criminal possession of a weapon charge, a class C violent felony offense which carries a maximum determinate term of fifteen years. Letter of Roger Brazill to Petitioner, dated February 2, 2001 (App. C.). According to counsel, the sentence on Hibbert's criminal possession charge could run consecutively to the second degree murder charge, which carries a maximum term of twenty-five years to life. Thus, counsel reasoned, "25 to life plus 15 years determinate consecutive [*sic*] makes a potential exposure of 40 years to life." *Id.* While counsel is correct that N.Y.S.2d Penal Law allows the imposition of a consecutive sentence on a criminal possession of a weapon charge, it is doubtful that this would have happened under the circumstances of Hibbert's case.

Hibbert was charged with second degree criminal possession of a weapon under § 265.03 of the Penal Law; the "essence of the illegal conduct" defined therein "is the act of possessing a weapon unlawfully." *People v. Almodovar*, 62 N.Y.2d 126, 130, 476 N.Y.S.2d 95 (N.Y. 1984). Once the evidence establishes a defendant's unlawful possession of the weapon, "the possessory crime is complete and any unlawful use of the weapon is punishable as a separate crime[.]" *Id.* (citations omitted). On the other hand, the Penal Law provides that sentences *must* run concurrently when two or more offenses are committed through a *single act* or through an act which itself constituted one of the offenses and also was a material element of the other. N.Y. Penal Law § 70.25(2) (emphasis added); *People v. Sturkey*, 77 N.Y.2d 979, 980-81, 571 N.Y.S.2d 898 (N.Y. 1991) ("Under the facts of this case, the robbery and possession offenses were committed through the single act of seizing the gun. Thus, defendant was properly convicted of both robbery and criminal possession of a weapon but the sentences for the two offenses must be concurrent under section 70.25(2) of the Penal Law[.]"). However, trial courts retain the discretion to impose consecutive sentences when separate offenses are committed through separate acts, even though they are part of a single transaction. *People v. Brown*, 80 N.Y.2d 361, 364, 590 N.Y.S.2d 422 (N.Y. 1992) (citations omitted). An "act" is defined by the Penal Law as a "bodily movement." N.Y. Penal Law § 15.00(1).

In *People v. Brown*, the New York Court of Appeals upheld the trial court's imposition of consecutive sentences. The court distinguished its precedents dealing with weapons possession and interrelated, ensuing substantive crimes by explaining that the evidence in the instant case "render[ed] it virtually certain that defendant did not initially possess the stolen vehicle for the purpose of recklessly endangering the lives of others[.]" Thus, in *Brown*, the defendant's mental state was "significantly discrete from that associated with the creation of the grave risk of death to others, *i.e.*, reckless endangerment." 80 N.Y.2d at 364. As the court explained in *Brown*, the case did not involve a "possessory offense with an instrumentality that is naturally or inherently interrelated[.]" *Id.* For those reasons, consecutive sentences were permissible. The circumstances of Hibbert's case arguably would have placed it in the category of cases where the possessory offense is "naturally or inherently interrelated" with the ensuing substantive crime. For instance, in *People v. Crosby*, the Fourth Department modified the judgment to make the defendant's sentences run concurrently on his convictions of second degree murder and second degree criminal possession of a weapon because the evidence adduced at trial did not establish "that for any period prior to the shooting, defendant possessed the gun with an intent distinct from his specific intent at the time of the shooting . . .

who would exaggerate a potential sentence to persuade a client to accept a plea-bargain has committed a fraud on the client, there is no evidence that trial counsel intentionally misrepresented the sentencing possibilities to Hibbert. Additionally, the Court has failed to discover any cases in which trial counsel was found to have rendered ineffective assistance in the plea context where he overestimated a defendant's potential sentence.

On the other hand, there is authority in this Circuit for finding constitutionally deficient representation where counsel grossly underestimated a defendant's possible sentence exposure and, on that advice, the defendant elected to proceed to trial and was convicted. *See United States v. Gordon*, 156 F.3d 376, 380-82 (2d Cir. 1998) ("By grossly underestimating [defendant]'s sentencing exposure in a letter to his client, [trial counsel] breached his duty as a defense lawyer in a criminal case 'to advise his client fully on whether a particular plea to a charge appears desirable.'") (quoting *Boria v. Keane*, 99 F.3d 492, 496 (2d Cir. 1996)). Obviously, this circumstance does not exist under the facts of this case. Hibbert seems to be implying that trial counsel's overestimation of the potential sentence was another factor counsel used to persuade Hibbert to plead guilty when in fact counsel should have been preparing for trial since "the prosecutor had no case." Pet'r Mem. at 25 (Docket #1). Contrary to Hibbert's contention, the prosecutor did have a compelling case against him, as discussed above.

It is troubling to the court that trial counsel effectively guided his client to accept a "straight up" plea where, as a practical matter, Hibbert got a maximum sentence after pleading guilty and thus did not get a "bargain" from his plea in this so-called plea bargain. However,

---

such that a possessory crime would have been complete prior to the shooting[.]" 265 A.D.2d 858, 696 N.Y.S.2d 596 (App. Div. 4th Dept. 1999) (quotation and citations omitted).

taken singly or together, none of counsel's alleged errors resulted in constitutional prejudice to Hibbert. Because he has failed to make a sufficient showing with respect to the prejudice prong of the *Strickland* standard, the Court need not evaluate the performance aspect of that test. *See* 466 U.S. at 697.

**2.      Knowingness and Voluntariness of Plea**

Hibbert argues that it was his responsibility to explain to the trial court "his action and conduct without being told by his attorney what to say[.]" Pet'r Mem. at 24 (Docket #1). He points to the "off the court Record discussion" between him and trial counsel as support for his argument that the plea allocution was coerced by counsel. *Id.*  Hibbert is referring to two occasions during the plea colloquy, the first of which occurred when the prosecutor asked Hibbert what he did when went to the nursing home where the victim worked:

| | |
|---|---|
| Mr. Cruikshank: | When you went to that location what did you do, Mr. Hibbert? |
| Mr. Hibbert: | I went near - - I was drunk. |
| Mr. Brazill: | Drunk. |
| Mr. Cruikshank: | You were intoxicated? |
| Mr. Hibbert: | Yes. |
| Mr. Cruikshank: | But you did know what you were doing, correct? |
| Mr. Hibbert: | Not very much. |
| (Discussion held off the record between the defendant and his counsel.) | |
| Mr. Cruikshank: | Despite your intoxication you knew what you were doing, correct, Mr. Hibbert? |
| Mr. Hibbert: | Yes. |
| Mr. Cruikshank: | And what did you do? |
| Mr. Hibbert: | I shot her. |
| Mr. Cruikshank: | Who did you shoot? |
| Mr. Hibbert: | Ella Reeves [*sic*]. |
| Mr. Cruikshank: | How many times did you shoot her? Four times, sir? |
| Mr. Hibbert: | I shot - - |
| Mr. Cruikshank: | If you have to recess - - |
| Mr. Hibbert: | I shoot. I don't remember how much I shoot, but I shoot. |
| Mr. Cruikshank: | It was more than one shoot [*sic*], correct? |

Mr. Hibbert:              Yes.

P.5-6.[8] The second off-the-record discussion occurred when the prosecutor questioned Hibbert

about his intent at the time of the shooting:

Mr. Cruikshank:          Okay. You intentionally shot her. You meant to shoot her,
                          correct?
Mr. Hibbert:              No, I didn't mean to shoot her, but I shoot her.
(Discussion held off the record between the defendant and counsel.)
Mr. Cruikshank:          I will ask you again, Mr. Hibbert. Did you intend to shoot
                          Ella Reeves [*sic*]?
Mr. Hibbert:              Yeah.
Mr. Cruikshank:          And you possessed that weapon for that purpose, correct?
Mr. Hibbert:              Yeah.
Mr. Cruikshank:          Thank you, Judge.

P.6.  I find it significant that although Hibbert claims that these off-the-record exchanges between

him and defense counsel are evidence of "coercion," Hibbert has never indicated what precisely

counsel said to him at those times:  Hibbert has never said that during those discussions, counsel

told him what to say or pressured him into pleading guilty. Moreover, the remainder of Hibbert's

plea colloquy supports a finding that Hibbert's plea was voluntarily made. Hibbert confirmed that

he had discussed the plea with his attorney and was entering the plea with counsel's advice and

consent. He stated that he understood that by pleading guilty he was admitting his guilt as to the

charges against him. The judge explained all of the rights that Hibbert was giving up in detail,

and Hibbert confirmed that he understood that he was giving up his right to a trial by jury, to

have the prosecution present witnesses against him, to have trial counsel cross-examine those

witnesses and bring in witnesses on Hibbert's behalf, to testify or not testify at trial, to require

that the prosecution prove his guilt beyond a reasonable doubt at trial, and to bring any motions.

---

[8] Citations to "P.__" refer to the transcript of the plea colloquy.

When asked if he was pleading guilty of his own free will, Hibbert answered affirmatively. He also confirmed that all his statements to the court were truthful.

Hibbert next argues that because he is "limited from an intellecual [*sic*] stand point [*sic*]," he "never really unstood [*sic*] what he was agreeing to when he took the plea offer on the advise [*sic*] of his attorney, and not upon his own free will." Pet't Mem. at 24 (Docket #1). Hibbert states that "Mr. Cruishank [*sic*] [the prosecutor], acknowledge[d] that he was having some difficulty in communication with the defendant, So he in July of that year, Had defendant tested, And the People's who conducted the test founded [*sic*] that the defendant Mr. Everton had an IQ of 59." *Id.* Hibbert actually is referring to the following statements made by trial counsel, Roger Brazill, at sentencing when he was discussing sentencing recommendations:

> . . . It is not the first homicide case that I have handled, nor the first case that has been before the Court. Normally, when you look at a homicide defendant you see someone who has had a history of breaking the law, and this is a final step in the process. Mr. Hibbert came to this country in search of a better life and was making steps towards that. He has no prior criminal record.
> In July of this year I had him tested psychologically because I was having some difficulty in communicating with him. The people who testify him found him to be significantly limited from an intellectual standpoint, an IQ of approximately 59. Despite that, he maintained steady employment as a painter and a metal worker, until the spring of 1999 when lifting a large object at work he sustained a severe injury to his back and was disabled on account of that.

S.6.  Although the transcript reads "Mr. Cruikshank," it is apparent from the context of the sentencing minutes that it was trial counsel who was speaking. These allegations do give the Court some pause.

In *Godinez v. Moran*, the Supreme Court articulated the standard for gauging a defendant's competence to plead guilty: he must have the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as

factual understanding of the proceedings against him." 509 U.S. 389, 396 (adopting the same competency standard used to judge a defendant's ability to stand trial, as set forth in *Dusky v. United States*, 362 U.S. 402 (1960)).  The case law is scanty regarding question of whether a person's mental retardation precludes him from knowingly entering a voluntary guilty plea. In *Henderson v. Morgan*, 426 U.S. 637 (1976), the Supreme Court overturned the conviction of a petitioner who had been committed to the Rome State School for Mental Defectives and classified as "retarded" and who was described by the court as "substantially below average intelligence." The petitioner had been indicted on charges of first degree murder and had pleaded guilty to second degree murder. The conviction was not overturned because the petitioner's mental disabilities prevented him from knowingly and voluntarily pleading guilty –rather, the *Morgan* court found that the plea was involuntary because petitioner had been unaware of the fact that intent to cause death was an element of second-degree murder and therefore had not received inadequate notice of the offense to which he pleaded guilty.

In the context of determining the voluntariness of a waiver of *Miranda* rights, courts have generally have concluded that "'no single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving . . . the constitutional rights embraced in the *Miranda* rubric.'" *United States v. Murgas*, 967 F. Supp. 695 (N.D.N.Y. 1997) (quoting *Fairchild v. Lockhart*, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989) (collecting and discussing numerous federal cases where the defendant's limited cognitive abilities were a factor in determining the validity of the waivers), *aff'd*, 900 F.2d 1292 (8th Cir. 1990); *see also Moore v. Dugger*, 856 F.2d 129 (11th Cir.1988) (holding that defendant's confession was voluntary, although testimony showed defendant had IQ of 62, functioned at

intellectual level of eleven-year-old, and was classified as educable mentally handicapped, and defendant claimed that at time he confessed he had been without food or sleep for 25 to 30 hours); *Harris v. Riddle*, 551 F.2d 936 (4th Cir. 1977) (holding that seventeen-year-old defendant with IQ of 67 had sufficient comprehension where expert testified that defendant had a sixth-grade intelligence and understood the right to remain silent, although not all of the consequences of giving up that right); *United States v. Young*, 529 F.2d 193, 195 (4th Cir. 1975) (holding that although defendant had a below average IQ, limited education and reading ability, he validly waived his rights; "these factors are not in themselves determinative of the voluntariness of a waiver, for one must examine the totality of the circumstances surrounding the waiver"); *United States v. Marenghi*, 896 F. Supp. 207 (D. Maine 1995) (holding that defendant with "cognitive limitations" and an IQ of 79 validly waived her *Miranda* rights), *aff'd*, 109 F.3d 28 (1st Cir. 1997).

After performing an exhaustive review of cases considering whether a defendant's lack of mental capacity, including low IQ,  precluded a knowing waiver of rights, the district court in *Fairchild* succinctly stated, "[s]hort of the level of absolute incapacity, the cases all consider lack of intelligence (and the related factor of low IQ) as one part of the totality of circumstances to be examined in deciding whether a waiver is knowingly made." 744 F. Supp. at 1450. The district court in *Fairchild* found a number of analytical flaws in petitioner's argument that because he was mentally retarded, he was, therefore, unable to intelligently waive his constitutional rights. *Id.* at 1454. The court elaborated as follows:

> First, the authorities seem to be in agreement that IQ scores are not dispositive of
> mental retardation, and that such measurements of intelligence make up only one
> of three elements of the overall clinical definition of retardation. Second,

> petitioner's giving paramountcy to IQ levels runs counter to most current teaching on the subject since advocates for the mentally retarded have usually argued that courts should place less emphasis on IQ scores when passing on such a defendant's competency and, instead, inquire more into the specific functional disabilities of putative mentally retarded criminal defendants. Finally, there is substantial recognition in the courts, growing out of long experience, that IQ tests and other forms of standardized testing have in the past exhibited patterns of racial, socio-economic, and cultural bias which would further call into question the accuracy of IQ scores.

*Id.*

According to the third edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-III"), the essential clinical features of mental retardation are (1) significantly subaverage general intellectual functioning, (2) resulting in, or associated with, deficits or impairments in adaptive behavior, (3) with onset before the age of eighteen. *Id.* (citing Diagnostic and Statistical Manual of Mental Disorders, 36 (3d ed. 1980)). As the *Fairchild* court pointed out, only the first element of the retardation definition–intellectual functioning–is measured by reference to an IQ score. *See id.* The DSM-III groups mentally retarded individuals into four categories or subtypes, using IQ scores as guideposts. *See id.* If Hibbert were found to fit the other criteria for mental retardation (deficits in adaptiveness occurring before age eighteen), his IQ score of 59 most likely would place him in the least severe category, known as "mild" mental retardation. *See id.* (citing  DSM-III at 39). Such a classification, however, depends upon establishing that Hibbert has deficits in adaptive behavior, which are not measured by IQ scoring. *See id.* By "adaptive behavior," the DSM-III "refers to the effectiveness with which an individual meets the standards of personal independence and social responsibility expected of his or her age and cultural group."*Id.* (quoting DSM-III at 37).

Aside from Hibbert's IQ score, the Court does not have before it any other results of the

psychological testing performed on Hibbert. However, the Court has gleaned from the record that Hibbert was living independently and supporting himself financially; counsel noted at sentencing that Hibbert had maintained steady employment as a painter and metal worker until he suffered a disabling back injury. Furthermore, the Court cannot discount the possibility that Hibbert's IQ score is skewed because he is an immigrant and is black. As the district court in *Fairchild* pointed out, measures of intelligence such as IQ testing "have been repeatedly attacked for their racial and cultural bias against blacks, immigrants and other minorities." *Id.* at 47 (noting that it was "well documented" that minorities do not perform as well as Anglo-Americans on standardized exams, "principally because of cultural and socioeconomic differences") (citing *Columbus Board of Educ. v. Penick*, 443 U.S. 449, 511 n. 17 (1979) (Rehnquist, J., dissenting)). Finally, the Court observes that Hibbert himself never informed anyone at any time that he was having difficulty understanding what was occurring in his criminal proceeding. Thus, the Court concludes that, Hibbert's admittedly low IQ, standing alone, is insufficient to serve as a basis for finding that he was incapable of knowingly, intelligently and voluntarily entering a guilty plea.

Moreover, Hibbert has not provided credible evidence that would justify overlooking his statements under oath that he was choosing to plead guilty of his own accord. In the context of a plea allocution, a defendant's "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *accord, e.g., Adames v. United States*, 171 F.3d 728, 732 (2d Cir. 1999). Such statements "are generally treated as conclusive in the face of the defendant's later attempt to contradict them." *Adames v. United States*, 171 F.3d 728, 732 (2d Cir. 1999) (citing *United States v. Gonzalez*, 970 F.2d 1095, 1101 (2d Cir. 1992) (no evidentiary hearing necessary where criminal defendant makes allegations that simply contradict his

statements made under oath at plea allocution); *United States v. Bambulas*, 571 F.2d 525, 526

(10th Cir. 1978) (statements at plea allocution are conclusive absent credible reason "justifying

departure from their apparent truth")). Based on what has been presented to his Court on habeas

review, the Court concludes that no evidentiary hearing is necessary to decide this claim. Relief

is accordingly denied.

## CONCLUSION

For the reasons stated above, petitioner Everton Hibbert's petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner

has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a

certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      February 16, 2006
            Rochester, New York.